NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 20-00689 (SRC) |
| v. | **OPINION & ORDER** |
| VINCENT CHAN-GUILLEN | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion to suppress filed by Defendant Vincent Chan-Guillen ("Chan-Guillen" or "Defendant") [ECF 83]. The United States of America ("the Government") filed its response to the motion [ECF 88, 99, 100], and Chan-Guillen replied to the Government's response [ECF 94]. The Court held an evidentiary hearing on March 4, 2022, during which it heard testimony from Officer Joseph White ("Officer White") of the Lyndhurst Police Department and Parole Officer Victor Luzuriaga ("Parole Officer Luzuriaga") of the New Jersey Parole Office. For the following reasons, the Court will deny Defendant's motion.

**I.    BACKGROUND**

Chan-Guillen has been charged with a string of robberies that occurred in New Jersey and New York between August 2018 and February 2019. The circumstances surrounding his arrest are as follows. On November 30, 2018, Officer White was on patrol on Wall Street West in Lyndhurst when he observed a motor vehicle without a front license plate driving in the opposite direction. (Tr. 9:5-12). Officer White made a U-turn in order to initiate a stop of the vehicle.

1

(Tr. 9:15-18). The vehicle eventually stopped in the parking lot of Wacoal, a warehouse in Lyndhurst. (Tr. 10:1-15).

As Officer White approached the car in the Wacoal parking lot, the driver, subsequently identified as Chan-Guillen, appeared to exit the vehicle. (Tr. 10:19-20, 11:9-15). When Officer White asked Chan-Guillen why he got out of the vehicle, Chan-Guillen told him that he was looking for a drink of water. (Tr. 12:15-17). During this interaction, Chan-Guillen also provided Officer White with his identification, informed him that his driving privileges had been suspended, and explained that the car was owned by his cousin. (Tr. 12:5-13, 13:3-12). Officer White then ran Chan-Guillen's name and learned that Chan-Guillen was on parole, and that he had an open warrant in Elizabeth. (Tr. 14:11-14, 51:12-18). Officer White also searched for the license plate number, but it did not appear in any database as belonging to the vehicle. (Tr. 14:6-10). Because the license plate number was not linked to the car, Officer White obtained the car's vehicle identification number (VIN). (Tr. 15:2-18). The VIN indicated that the car should have had a different license plate number. (Tr. 17:1-3). It also indicated that the car was registered to a woman rather than Chan-Guillen's male cousin. (Tr. 17:1-3). Later that day, Office White contacted the woman to whom the car was registered. (Tr. 32:2-6). She told him that she had recently sold the car to Chan-Guillen for $1,000 and provided the police with a copy of Chan-Guillen's identification card (similar to the one that he showed Officer White) and the vehicle title. (Tr. 32:11-18; Gov. Ex. 103).

Eventually, multiple Lyndhurst police officers arrived at the scene. The officers gave Chan-Guillen an opportunity to look for the license plate that should have been affixed to the car. (Tr. 18:25–19:1-10). Chan-Guillen looked in the passenger compartment of the car but could not

2

find the license plate. (Tr. 19:1-10). The officers also asked to search the trunk of the car, but Chan-Guillen did not provide his consent to that search. (Gov. Ex. 201 at 6:45-7:35). The reason he gave for denying consent was that he could not consent because the vehicle was owned by his cousin, not him. (Gov. Ex. 201 at 6:45-7:35). Finally, Chan-Guillen was arrested for the outstanding warrant and transported back to the Lyndhurst police station. (Tr. 27:20-21, 28:13-18). The car was impounded and also taken to the police station. (Tr. 28:20-22).

At the station, the Lyndhurst police notified the New Jersey Parole Office that Chan-Guillen had violated his parole by driving a car without a valid license. (Tr. 38-17; 38:21-22, 39:23-25). Parole Officer Luzuriaga and, his partner, James Campbell arrived at the police station to question Chan-Guillen about the incident. (Tr. 39:9-12). Chan-Guillen provided a written statement to the parole officers concerning the incident and indicated in the statement that he would "give consent. . . if [he] had a lawyer present to give [him] legal co[unsel]." (Gov. Ex. 109). According to Officer Luzuriaga's testimony, after taking Chan-Guillen's statement, he verbally discussed the consent process with him. (Tr. 91:18-25–92:1). Chan-Guillen then "filled out portions of [a consent-to-search] form himself, signed it, and . . . stated he wanted to be present when the vehicle would be searched." (Tr. 90:8-10).

Notably, the consent-to-search form is incomplete. (Gov. Ex. 110). The standard form allows a user to identify two separate pieces of information using checkboxes. First, the user may either check "Consent Granted" or "Consent Denied." Second, the form states, "I waive my right to be present during the search" and then has a "Yes" checkbox and a "No" checkbox next to that statement. Here, the only box that is checked on the form is next to "No" indicating that Chan-Guillen did not waive his right to be present during the search. (Gov. Ex. 110). Neither

3

the "Consent Granted" nor the "Consent Denied" box is checked.  Officer Luzuriaga testified that the failure to check the "Consent Granted" box was a clerical oversight.  (Tr. 96:5-9).

Nevertheless, after Chan-Guillen signed the consent-to-search form, the parole officers searched the trunk of the vehicle and found a Charles Daly .45 caliber pistol, ammunition, a black hat, and a black-hooded sweatshirt that was worn during the several of the robberies.  Subsequent ballistics testing of the pistol indicated that it was the same one that had discharged a shell casing recovered from a robbery in Bloomfield, New Jersey weeks earlier.

A couple months later, Chan-Guillen appeared at a parole revocation hearing.  (Gov. Ex. 108).  He indicated that he wished to appear pro se at this hearing.  (Gov. Ex. 108, 9:214-18).  While under oath, he questioned one of the parole officers present at the hearing regarding the basis for the search of his vehicle.  (Gov. Ex. 108, 21:489-502).  During this questioning, Chan-Guillen stated: "And you said that as well that I consented to the form. I did because I was told that. . . if I was innocent, like I am, . . . I wouldn't get in trouble for it."  (Gov. Ex. 108, 21:492-96).

In August 2020, a grand jury returned a multiple-count indictment related to the robberies against Chan-Guillen and an alleged co-conspirator.  In July 2021, Chan-Guillen filed an omnibus pretrial motion, seeking, as relevant here, the suppression of evidence seized during the search of his vehicle by the parole officers.  The Court granted his request for an evidentiary hearing in conjunction with that motion.  The evidentiary hearing was held on March 4, 2022, and the parties submitted supplemental briefing on the motion after the hearing [ECF 104 & 105].  As such, the motion to suppress is now ripe.

4

## II. DISCUSSION

Defendant seeks to suppress the items found during the search of his vehicle, arguing that the search violated his Fourth Amendment rights. The Fourth Amendment guarantees the right of individuals to be "secure in their persons, house, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Normally, the Fourth Amendment requires that officers have a warrant issued upon probable cause to conduct a search. United States v. Baker, 221 F.3d 438, 443 (3d Cir. 2000). Here, it is undisputed that the Government did not have a warrant to search Chan-Guillen's vehicle. However, the Government relies on two exceptions to the warrant requirement to justify the search. First, the Government argues the officers had reasonable suspicion to search Chan-Guillen's vehicle, which is all that was required because of Chan-Guillen's status as a parolee. (Gov. Supp. Br. at 1–5); Baker, 221 F.3d at 443. Alternatively, the Government maintains that Chan-Guillen consented to the search. (Gov. Supp. Br. at 5–6); Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (explaining that the warrant requirement does not apply to "situations in which voluntary consent has been obtained. . . ."). The Court addresses both of the Government's justifications for the search below.

### A. Reasonable Suspicion

In this case, a condition of Chan-Guillen's parole was that he submit to a warrantless search by a parole officer "any time [there is] a reasonable, articulable basis to believe that the search will produce contraband or evidence that a condition of supervision has been violated, is being violated or is about to be violated. . . ." (Gov. Ex. 105 ¶ 19). The Third Circuit has previously upheld parole searches based on reasonable suspicion and neither party contests the use of this standard here. Baker, 221 F.3d at 443. As such, the Court must evaluate whether

5

there was a reasonable, articulable basis to believe the search of Chan-Guillen's vehicle would produce contraband or evidence of a parole violation.

To determine whether the search of Chan-Guillen's vehicle was supported by reasonable suspicion, the Court must address two issues: (1) whether Chan-Guillen's interaction with the police gives rise to particularized facts establishing reasonable suspicion, and (2) whether the parole officers who performed the search but were not present when Chan-Guillen was arrested were entitled to rely upon facts establishing reasonable suspicion both known to them and known to the officers who made the arrest. The Court answers both questions in the affirmative.

First, there was reasonable suspicion to search Chan-Guillen's vehicle. Reasonable suspicion is "something less than what is required to establish probable cause." United States v. Henley, 941 F.3d 646, 651 (3d Cir. 2019) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). In making a reasonable suspicion determination, the court looks at the totality of the circumstances to verify whether the police had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available." Id.

Here, the facts of Chan-Guillen's stop and eventual arrest by the Lyndhurst police establish reasonable suspicion. For one, Chan-Guillen was on parole and driving without a license. (Tr. 13:10-12, 14:6-14). Further, when Chan-Guillen was stopped, he pulled into the Wacoal parking lot, haphazardly parked across two parking spots, and exited the vehicle. (Tr. 10:2-9). When Officer White asked why he had parked at Wacoal Chan-Guillen responded that

6

he was trying to get a drink of water. (Tr. 12:15-23). But this explanation is illogical because the Wacoal warehouse is not a building in which someone unaffiliated with Wacoal could expect to find water. Based on these actions during their initial encounter, Officer White characterized Chan-Guillen as nervous, evasive, and attempting to disassociate himself from the vehicle. (Tr. 16:15-20); see Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

Moreover, Chan-Guillen's story about the ownership of the car heightened the officers' suspicions. Chan-Guillen told the officers that the car was owned by his cousin, (Tr. 13:3-6), but he could not remember basic information about his cousin, such as where he lived, (Tr. 17:1-16). In fact, prior to the search of the vehicle, the officers learned facts that provided a substantial basis to believe that Chan-Guillen's story about the ownership of the car was false: the car was not owned by Chan-Guillen's male cousin but rather owned by a woman who had sold the car to Chan-Guillen a month before. (Tr. 17:1-2, 32:2-18); see United States v. Stewart, No. 18-cr-00310, 2021 WL 2478440, at *12 (M.D. Pa. June 17, 2021) (explaining that a police officer's suspicion of criminal activity was "objectively reasonable based on numerous factors including. . .[the defendant's] driving a vehicle registered to a third person, [and] his imprecise answers to questions related to the registrant and his use of the vehicle"). Finally, when the officers gave Chan-Guillen the opportunity to look for the license plates that were supposed to be affixed to the car, he checked the entire vehicle except the trunk, raising the officers' suspicions about the contents of the trunk.[1] (Tr. 19:3-18).

---

[1] Counsel for Chan-Guillen suggested at the evidentiary hearing that the officers' suspicion related to Chan-Guillen's refusal to consent to the search was an improper basis for establishing reasonable suspicion. If Chan-Guillen had simply denied the officers permission to search the trunk, this argument would indeed have substantial force. But that is not the case here. In this case, while Chan-Guillen readily undertook a search of the interior of the

7

The facts here are dissimilar from those in United States v. Baker, 221 F.3d 438 (3d Cir. 2000). There, a parolee was arrested for violating his parole after he drove to the parole office without a license. Id. at 440. The parole officers then searched his car and found drug paraphernalia in the trunk. Id. at 440–41. The Third Circuit held that the officers did not have reasonable suspicion for the search because there were not particularized facts indicating that the parole officers would find evidence of a further violation of parole in the vehicle. Id. at 444. Although there was some discrepancy regarding the ownership and registration of the car, the officers were not aware of this discrepancy until after the search was completed. Id. And the Third Circuit hypothesized that, even if the parole officers did know about the discrepancy regarding the registration of the vehicle prior to the search, it would not be enough to establish reasonable suspicion. Id. at 444–45.

The Lyndhurst police officers had a significantly more detailed basis for suspecting legal wrongdoing than the parole officers in Baker. The only fact supporting the officers' reasonable suspicion in Baker was that the defendant was driving without a license in violation of his parole. See Baker, 221 F.3d at 444 ("There is no evidence in the record that the parole agents who searched Baker's trunk had yet discovered the inconsistencies between the title/registration and Baker's statements regarding the ownership of the car when they searched the trunk."). By contrast, here, the officers were aware that Chan-Guillen was driving with a suspended license and also became aware of various other suspicious circumstances related to his vehicle during their extended interaction with him. Importantly, this included the fact that he was lying to them

---

vehicle, when presented with the opportunity to look for the license plates in the car's trunk, he denied the officers permission to search and gave an explanation which ultimately appeared to be demonstrably false. The falsity of this explanation is a factor the officers could properly take into consideration when evaluating the totality of the circumstances.

about the ownership of the car. As mentioned above, the Baker court speculated that knowledge of the discrepancy regarding the vehicle's ownership in that case would still be insufficient to establish reasonable suspicion. But Chan-Guillen's false statement that his cousin owned the car is materially different from Baker because Chan-Guillen offered that fact as the reason he could not allow the officers to search the car. (Gov. Ex. 201 at 6:45-7:35). Thus, not only did the officers know Chan-Guillen was lying to them, they knew he was lying to them in order to avoid a search of the vehicle. See United States v. Wormsley, No. 16-cr-00018, 2016 WL 10672078, at *8 (W.D. Pa. Aug. 17, 2016) (finding that parole officers had reasonable suspicion to conduct a protective sweep of a parolee's residence partly because the parolee provided them with information that they believed to be false "based on their own visual and auditory observations" of the scene). This reasonably heightened the officers' suspicions that there might be contraband in the vehicle, and, when combined with the other facts discussed above, is sufficient to establish reasonable suspicion.[2]

Second, the record establishes that the Lyndhurst police officers made the parole officers aware of the facts establishing reasonable suspicion prior to parole's search of Chan-Guillen's vehicle at the Lyndhurst police station. Chan-Guillen argues that the parole officers only had a "hunch" that there was something in the vehicle because the Lyndhurst police officers "failed to inform parole of particularized facts" establishing reasonable suspicion. (Def. Supp. Br. at 3). This argument is contradicted by the testimony at the evidentiary hearing. Officer White

---

[2] The fact that two canine sweeps for drugs and firearms, respectively, came up negative does not negate the officers' reasonable suspicion that there was contraband in Chan-Guillen's car. As the Government points out, the canine responsible for detecting explosives and firearms will only return a positive result if there is a large amount of ammunition present or if the firearm has been recently fired. (Tr. 37:3-8). Thus, just because that canine did not return a positive result does not mean that the officers' suspicion that there might be contraband, such as firearms, in the vehicle was unreasonable especially given Chan-Guillen's prior conviction for possession of a firearm. (Gov. Ex. 105).

testified that he and another officer spoke to the parole officers when they arrived at the Lyndhurst police station, (Tr. 38:20-23, 39:9-20), and told them about "the details of the motor vehicle stop, the fictitious license plate, the fact that [Chan-Guillen] was driving on a suspended license, [and] his evasiveness in questions," (Tr. 39:23-25).  Officer White also testified that he and the other officer told the parole officers about Chan-Guillen's explanation that he stopped at Wacoal for a drink of water.  (Tr. 40:1-3).  Finally, he testified that the Lyndhurst officers relayed Chan-Guillen's false narrative regarding the ownership of the vehicle to the parole officers.  (Tr. 40:14-24).

      For his part, Parole Officer Luzuriaga also testified as to the details of this conversation. He recalled that Officer White was present during this conversation but did not speak.  (Tr. 84:18-19).  He testified that the other Lyndhurst officer told him and his partner that Chan-Guillen's "story just wasn't adding up as to why he was at that location and as to who the vehicle belonged to."  (Tr. 85:2-4).  He further testified that the Lyndhurst police told them that the vehicle had fictitious plates, (Tr. 106:23-24), that Chan-Guillen had a suspended license, (Tr. 106:20-21), and that he was arrested on an outstanding warrant, (Tr. 107:3-5).

      Although Parole Officer Luzuriaga's testimony is less detailed than Officer White's regarding the specific facts that the Lyndhurst police provided him at the police station, there is nothing in his testimony that contradicts Officer White's recollections of the conversation. Given the consistency between the two accounts, the Court finds Officer White's version of events credible and concludes that the Lyndhurst police officers relayed all of the pertinent information establishing reasonable suspicion—including the facts related to Chan-Guillen's

10

actions when he was pulled over and the false narrative regarding the ownership of the car—to the parole officers prior to the search of the vehicle.

To the extent there were gaps in the information conveyed to the parole officers, the collective knowledge doctrine applies. Under the collective knowledge doctrine "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest." United States v. Whitfield, 634 F.3d 741, 745 (3d Cir. 2010). As such, "determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" United States v. Gonzalez, 630 F. App'x 157, 161 (3d Cir. 2015) (alteration in original) (quoting United States v. Hensley, 469 U.S. 221, 231 (1985)). Thus, even if the Lyndhurst police officers failed to relay some of the facts establishing reasonable suspicion to the parole officers, those facts may still properly be attributed to the parole officers pursuant to the collective knowledge doctrine.

In sum, the Court finds that there were particularized facts establishing reasonable suspicion to search Chan-Guillen's vehicle and that the parole officers were aware of those facts. As such, the search of Chan-Guillen's car was valid because it was supported by reasonable suspicion.

### B. Consent

The Court also finds Chan-Guillen consented to the search. Consent must be "voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). "To justify a search based on consent, the Government 'has the

burden of proving that the consent was, in fact, freely and voluntarily given.'" United States v. Price, 558 F.3d 270, 277–78 (3d Cir. 2009) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). There is no "talismanic definition of voluntariness." Schneckloth, 558 F.3d at 278. Rather, the voluntariness of consent is determined by the totality of the circumstances. Price, 558 F.3d at 278. In analyzing the totality of the circumstances, consideration of "the characteristics of the accused and the details of the interrogation are useful." Id. (internal quotation omitted). More specifically, the Third Circuit has identified following factors as relevant: "the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, whether the questioning was repeated and prolonged," United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994), "the setting in which consent was obtained, [and] the parties' verbal and non-verbal actions," United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). These factors should not be applied mechanically, and no single factor is controlling. Price, 558 F.3d at 278.

Here, Chan-Guillen signed a consent-to-search form in the presence of the parole officers at the Lyndhurst police department. (Gov. Ex. 110; Tr. 90:6-10). He was not coerced or otherwise unduly influenced when he signed this form. Chan-Guillen is an adult of seemingly average intelligence who had previous experience interacting with law enforcement. These personal characteristics weigh in favor of finding that his consent was voluntarily. United States v. Chalas-Felix, 424 F. Supp. 3d 316, 334 (D. Del. 2019) (holding consent to search was voluntary partly because the defendant was "of average intelligence" and "had previous experience with the criminal justice system").

Moreover, there is an abundance of evidence indicating that Chan-Guillen was aware of his right to refuse consent when he signed the form.  At the police station, he was read his rights, (Tr. 45:5-7), and specifically told he did not have to consent to the search, (Tr. 94:2-4). Additionally, the consent-to-search form, which was also read to Chan-Guillen, (Tr. 90:6-7), clearly states that the user has a right to refuse consent if he so chooses, (Gov. Ex. 110).  United States v. Baer, No. 15-cr-00417, 2016 WL 4718214, at *6 (D.N.J. Sep. 9, 2016) (holding consent was voluntary where the defendant signed a consent-to-search form "advis[ing] him of his constitutional right to refuse to consent to the search").  And Chan-Guillen had previously withheld consent from the Lyndhurst police officers after they initially pulled him over in the Wacoal parking lot.  (Gov. Ex. 201 at 6:45-7:35); see United States v. Thame, 846 F.2d 200, 203–04 (3d Cir. 1988) (finding that consent was eventually freely given even after the defendant had initially refused to consent).  Finally, before signing the consent-to-search form, Chan-Guillen gave a written statement indicating that he would only consent to the search if he was provided with counsel.  (Gov. Ex. 109).  All of this indicates that he knew he did not need to consent to the search.  This knowledge, while not required to render consent voluntary, leads to the inference that Chan-Guillen's consent was freely given.  United States v. Mendenhall, 446 U.S. 544, 558–59 (1980) (describing knowledge of the right to consent as a factor that is "highly relevant" to the voluntariness determination which "substantially lessen[s] the probability" that police conduct is coercive).

Lastly, the environment in which Chan-Guillen provided consent was not unreasonably coercive.  Chan-Guillen had been in police custody for hours and was in an interview room at the police station when he consented to the search.  (Tr. 41:7-9, 89:10-11).  To be sure, as Chan-

13

Guillen argues, the custodial nature of these circumstances is important. (Def. Opening Br. at 7–8) (arguing that the custodial setting casts doubt on the voluntariness of Chan-Guillen's consent); United States v. Zaleski, 559 F. Supp. 2d 178, 186 (D. Conn. 2008) ("The fact that a defendant is in custody does not alone vitiate his consent to a search [but it] does require more careful scrutiny." (internal quotation omitted)). However, Chan-Guillen was not handcuffed when he was interviewed by the parole officers. (Tr. 89:5-7); United States v. Thurman, 889 F.3d 356, 367 (7th Cir. 2018) (explaining that the defendant's consent was provided voluntarily partially because his handcuffs were removed when he was interviewed); United States v. Crisolis-Gonzalez, 742 F.3d 830, 837–38 (8th Cir. 2014) (same). Furthermore, although he had been in police custody for an extended period, the parole officers were the only ones to interview Chan-Guillen during this time, and they only questioned him for forty-five minutes before he consented to the search. (Tr. 93:23-25). Parole Officer Luzuriaga described the interview as "conversational." (Tr. 89:14); United States v. Giles, No. 07-cr-00192, 2008 WL 282369, at *5 (M.D. Pa. Jan. 31, 2008) (concluding consent was freely given because "[t]here [was] no suggestion that the questioning officers were unduly aggressive with their questioning, or punishing in their behavior").[3] Thus, viewing these circumstances in combination with the factors discussed above, the Court cannot conclude Chan-Guillen's consent was involuntary based on the fact that he was in police custody.

Nor does Chan-Guillen identify any other circumstances that would call into question the voluntariness of his consent. He primarily makes two arguments. First, he argues that he

---

[3] In his supplemental briefing, Chan-Guillen appears to argue the officers acted in a threatening manner. To substantiate this argument, he identifies a single line in his voluntary statement asserting the officers told him they "were going to find everything." (Def. Supp. Br. at 4–5 (citing Gov. Ex. 109)). Given the minimal factual support provided by Chan-Guillen, the Court rejects his contention that the officers threatened him.

14

informed the officers that he would "only provide consent if he was given counsel." (Def. Supp. Br. at 4). To begin with Chan-Guillen did not have a Sixth Amendment right to counsel at this time because the interaction did not occur at a critical stage of the proceedings.[4] United States v. Kon Yu-Leong, 910 F.2d 33, 39–40 (2d Cir. 1990) (holding that a consent to search is not a critical stage of a criminal proceeding). Even further, Chan-Guillen's argument is belied by the events at the police station. Parole Officer Luzuriaga testified that he "verbally" discussed the consent process with Chan-Guillen before Chan-Guillen signed the consent-to-search form. (91:25–92:1). Moreover, Parole Officer Luzuriaga also testified that, after signing the form, Chan-Guillen "stated he wanted to be present when the vehicle was searched," which provides further indication that his consent was voluntary. (Tr. 90:8-10). Chan-Guillen has presented no testimony controverting Parole Officer Luzuriaga's recollection of these events. Indeed, if, as Chan-Guillen argues, his consent was contingent upon the opportunity to speak to counsel, he presumably would have spoken up either before, during, or after signing the form or as he subsequently watched the police search his vehicle before he had spoken to a lawyer. But Chan-Guillen has not identified any evidence or testimony that he in fact objected during this entire process. (Tr. 43:2-8) (officer testimony that Chan-Guillen did not say anything during the search and his demeanor did not change).

Second, Chan-Guillen argues the consent-to-search form was incomplete thereby indicating that he did not voluntarily provide his consent. As mentioned above, the "Consent Granted" box on the consent-to-search form is not checked. (Gov. Ex. 110). Chan-Guillen

---

[4] To the extent Chan-Guillen argues the search of his vehicle violated his right to counsel under the Fifth Amendment, this argument is also unavailing because "consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address." United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993).

contends that the failure to check this box means that he never authorized the search of the vehicle. (Def. Supp. Br. at 5).

Contrary to Chan-Guillen's position, the incomplete form does not vitiate his consent. As noted above, Parole Officer Luzuriaga's testimony that Chan-Guillen orally stated he wanted to be present during the search, (Tr. 90:8-10), is not contradicted by any evidence presented by Chan-Guillen. And, importantly, the form also indicates Chan-Guillen did not waive his right to be present during the search. The only reason Chan-Guillen would have made this statement and the corresponding box on the form would be checked is if he also agreed to consent to the search in the first place.

Finally, and most significantly, as discussed at length above, Chan-Guillen admitted at a parole revocation hearing that he consented. While under oath at this hearing, he stated "I did [consent] because I was told that. . . if I was innocent, like I am, . . . I wouldn't get in trouble for it." (Gov. Ex. 108, 21:493-96). As such, the circumstances indicate the failure to check the "Consent Granted" box was an oversight. (Tr. 96:7-9) (parole officer testimony describing the unchecked box as "an oversight on [his] part"). The Court declines to conclude that Chan-Guillen's consent was involuntary on the basis of this oversight alone.

In all then, the Court concludes that the Government established that Chan-Guillen freely and voluntarily provided his consent to search the vehicle.

### III. ORDER

For the foregoing reasons, it is **SO ORDERED** that Defendant's motion to suppress [ECF 83] is **DENIED**.

   s/ Stanley R. Chesler     
STANLEY R. CHESLER

United States District Judge

Dated: April 1, 2022